AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, UNIVERSITY OF NEBRASKA CHAPTER, UNIVERSITY OF NEBRASKA, LINCOLN, NEBRASKA, APPELLEE, V. BOARD OF REGENTS OF THE UNIVERSITY OF NEBRASKA, APPELLANT, UNIVERSITY OF NEBRASKA LAW FACULTY ASSOCIATION, INTERVENER-APPELLEE, FACULTY OF THE COLLEGE OF DENTISTRY, UNIVERSITY OF NEBRASKA-LINCOLN, INTERVENER-APPELLEE.

253 N. W. 2d 1

Filed April 13, 1977. Nos. 40655, 40734.

L. Bruce Wright of Cline, Williams, Wright, Johnson & Oldfather, for appellant.

Patrick W. Healey of Healey, Healey, Brown & Wieland, for appellee.

Theodore L. Kessner of Crosby, Guenzel, Davis, Kessner & Kuester, for intervener-appellee University of Nebraska Law Faculty Assn.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

BRODKEY, J.

This is an appeal by the Board of Regents of the University of Nebraska from a determination of the Court of Industrial Relations establishing the scope and composition of bargaining units of academic employees under section 48-838, R. S. Supp., 1974. The issue raised on appeal is the propriety of the scope and composition of the bargaining units found to be appropriate by the Court of Industrial Relations (CIR). We affirm.

On July 28, 1975, the American Association of University Professors, University of Nebraska—Lincoln Chapter (AAUP/UN-L), the petitioner and appellee herein, filed a petition in the Court of Industrial Relations for election and recognition as the exclusive bargaining agent for a proposed unit of University of Nebraska employees, as described in the petition. The proposed unit included the full-time academic faculty of the University of Nebraska—Lincoln (UN-L), the members of which hold, or are eligible to hold, continuous appointments, including chairmen and directors of departments, but excluding persons holding a rank higher than a chairman or director of a department. The proposed unit did not purport to include faculty of the University of Nebraska—Omaha (UN-O), nor the faculty of the University of Nebraska Medical Center (UNMC). Subsequent to the filing of the petition, the petitioner agreed that the proposed unit also should not include the faculties of the College of Dentistry and the College of Law. The petition alleged that more than 30 percent of the employees of the proposed unit had signed appropriate authorization cards, which fact the clerk of the Court of Industrial Relations verified. Petitioner prayed that the CIR find the proposed unit to be appropriate, and order an election to determine whether it should be the exclusive bargaining agent for the unit.

The respondent, the Board of Regents of the University of Nebraska (the Board), denied the propriety

of the proposed bargaining unit in its answer, and alleged that the proper unit should be a multi-campus unit sufficient in scope to cover all University employees holding academic rank, not only those on the faculty of UN-L. The Board also alleged that chairmen and directors of departments should not be included in any bargaining unit because they are supervisors and a part of management.

The faculties of the College of Law and the College of Dentistry intervened in the action, each praying that they be designated as a separate bargaining unit, and that they be expressly excluded from the definition of any other bargaining unit proposed by the petitioner or the Board. Representatives of the faculty of UN-O and UNMC did not formally intervene in this case, nor did they appear at any proceedings or present to the CIR their position on what bargaining unit would be appropriate.

Hearing was had on September 25, 1975, at which time all parties introduced evidence on the issues. In its opinion filed November 26, 1975, the Court of Industrial Relations established three bargaining units, as follows:

"1. All full-time members of the University of Nebraska at Lincoln faculty other than members of the Faculty of Law and Dentistry, who are employees of the University of Nebraska at Lincoln and who hold faculty rank conferred on the recommendation of an academic department or academic school of the University of Nebraska at Lincoln, and who do not hold administrative positions higher than that of a chairman of a department or of director of a school or their equivalent. A faculty member holding an administrative position who reports directly to a Vice Chancellor holds a position higher than that of chairman of a department or of director of a school. County and Home Agents shall be included in this unit.

"2. All full-time 'A' line employees of the College

of Dentistry not above Department Chairman or equivalent.

"3. All full-time 'A' line employees of the College of Law not above Department Chairman or equivalent." The CIR ordered an election to be held within each of the above units within a reasonable time.

The Board's motion for rehearing filed December 3, 1975, was overruled February 10, 1976, and it then filed a notice of appeal and motions to stay the elections and fix the amount of a supersedeas bond, the motions being directed at postponing the elections until final resolution by this court of the propriety of the bargaining units established by the Court of Industrial Relations. The motion to stay the elections was overruled, and the CIR deferred judgment on the motion to fix the amount of a supersedeas bond until after the elections. Elections in each unit were held on February 16, 1976, and only the faculty of the College of Law voted in favor of establishing a bargaining representative for its unit. On March 9, 1976, the CIR certified the Nebraska Law Faculty Association as the exclusive collective bargaining agent for that unit. The Board then filed its second notice of appeal to this court.

Although the Board lists 28 assignments of error in its brief, essentially the issues involved in this appeal are: (1) Whether the CIR erred in establishing the three bargaining units, as set forth above, rather than finding that one bargaining unit for all academic employees of the University of Nebraska was appropriate, as claimed by the Board in its answer; and (2) whether it was error to include chairmen and directors of departments in the bargaining units.

The evidence presented in this case was voluminous, and a summary of the relevant facts is as follows. The University of Nebraska, established in 1869, is the state's most comprehensive institution of higher education. The College of Dentistry, the College of Law, and the College of Medicine all became

part of the University between 1891 and 1918. The University of Nebraska at Omaha did not become part of the University system until 1968, and prior to that time was Omaha's Municipal University. The addition of UN-O to the University of Nebraska system in 1968 was a significant change in the structure of the University, and to accommodate this change a Central Administration was established to deal with the management and coordination of the entire institution.

Both prior to and subsequent to the addition of UN-O, the University has been a statewide University with its general government vested in an executive body known as the Board of Regents of the University of Nebraska. Article VII, section 10, of the Constitution of Nebraska, provides that the general government of the University shall, under the direction of the Legislature, be vested in the Board, the members of which are elected from districts established by the Legislature.

The Board has, since the addition of UN-O, established a branch, entitled Central Administration, vested with the power and authority, subject to the direction and control of the Board, to (1) exercise executive powers for proper governance of the University; (2) enforce the regulations and orders of the Board and issue directives and executive orders in accordance with existing policy of the Board; and (3) direct planning and development, appraise all activities of the University, and be responsible for their coordination and implementation. The Central Administration is administered by the President of the University, and the Board has also created positions of executive vice president in the Central Administration.

The University is divided into three major administrative units, each of which has its own administrative staff headed by a Chancellor, who is also a University vice-president. These major administrative

units are UN-L, UN-O, and UNMC. Each administrative unit is divided into colleges and departments. A Dean administers each college, and a chairman or director administers each department.

Within the foregoing general organization framework, the University employs approximately 5,900 full-time employees, who are designated as either "A" line, "B" line, or "C" line individuals. "A" line employees are those individuals holding the positions of professional staff, academic-administration staff, or other academic staff. The University currently employs approximately 2,200 "A" line personnel. The employees involved in this case are all "A" line employees.

The governing document of the University is the by laws of the Board of Regents. Under these by laws, the Board has established its authority "to make such rules and regulations as it deems appropriate and necessary for the proper governance and administration of the University." The by laws set forth the structure of the University, and define the duties and responsibilities of the President and the Chancellors. The President, as previously stated, has the responsibility to exercise powers of the Central Administration, and carry out policies established by the Board. The by laws provide that the Chancellors of each administrative unit, subject to the guidelines and policies of the Board and the President, "shall do all things necessary for the development of the major administrative unit for which he is responsible." These duties include recommending personnel appointments to the President and the Board, planning and developing all activities of his unit, and submitting annual budgets for operations and construction to the President covering all activities assigned to his unit.

Under the by laws, the immediate government of each college within an administrative unit shall be by its own faculty. See, also, §§ 85-111 and 85-108, R. R.

S. 1943. Such power expressly includes adoption of attendance rules, determination of requirements for graduation and recommendations of candidates therefor, developing research and extension programs, discipline of students for conduct solely affecting the college, and providing to the Board recommended admission requirements, courses of study and other relevant material for meeting statutory requirements. Each college is to be administered by a Dean, who shall be recommended to the President and the Board by the Chancellor of the administrative unit.

The by laws further provide that the Board may create departments of a college or school, and that the chairman of the department shall be the officer primarily charged with the administration of the department. Appointment of a department chairman is by the Board upon recommendation of the Dean, after appropriate consultation with the department faculty, and with concurrence by the Chancellor and the President. The department chairmen have the responsibility of making recommendations to the Dean concerning the welfare of their departments, but shall consult with the appropriate departmental faculty before so doing.

The by laws also provide that the faculties of each major administrative unit shall establish a governing agency for dealing with matters of interest to more than one college. Such governing agencies may appeal directly to the Board in regard to matters of academic freedom and faculty status, after exhausting normal administrative channels. Both UN-L and UN-O, pursuant to this provision of the by laws, have established faculty senates. There is no system-wide faculty senate.

The Board has the sole power to make appointments or to contract for services of the academic-administrative staff, and every appointment by the University to such a position shall be in writing and signed by the Board or its authorized agent. It is pro-

vided that each major administrative unit of the University shall prepare written standards which shall be used in making all decisions on promotions, awarding continuous appointments, and merit salary adjustments. Each unit is also responsible for establishing procedures for gathering relevant information from all sources, including student evaluations and peer judgments, as part of an annual review of faculty performance, this review to be considered in determining merit salary adjustments, promotions, and in awarding continuous appointments. Each administrative unit shall also create an elected faculty Committee on Academic Freedom and Tenure which has specified powers under the by laws.

It is clear under the by laws, as well as under its constitutional grant of authority, that the Board is the ultimate governing body of the University of Nebraska, although under the direction of the Legislature. The parties agree that the Board has final formal authority to grant appointments, grant degrees, grant tenure and promotions, and establish a budget for the University as a whole and for each major administrative unit. It is also true, however, that the by laws themselves indicate that power and authority to make decisions affecting employees is diffused throughout the University; and that the Presidents, Chancellors, and Deans play an important role in the decision-making process; and also that the Board often acts upon the recommendation of such personnel.

The testimony at the hearing below shows that the petitioner (AAUP/UN-L) has approximately 200 members, 12 to 24 of which are department chairmen. There are separate chapters of the AAUP at UN-O and UNMC, but the petitioner is the only chapter of any size, and no other chapters have expressed the desire or decided to pursue collective bargaining.

The witnesses for the petitioner were professors who are currently, or who have previously been, officers of the petitioner; or who have been involved with

the AAUP/UN-L during various stages of its existence. In support of their position that a separate bargaining unit for UN-L faculty is appropriate, these witnesses testified that procedures of governance in the University are confined to the administrative unit boundaries, and that system-wide bargaining would disrupt long-standing, established practices of University administration. Although petitioner's witnesses recognized that the Board has the ultimate, formal authority to make decisions regarding the University, they stated that traditionally, historically, and realistically the faculty of each major administrative unit has been treated individually, has taken part in University government on a unit basis, and has a community of interest and sense of collegiality confined to the unit.

Although witnesses for the petitioner testified to a large number of facts which petitioner contends support its position, the following facts appear to be the most important. UN-O and UN-L have separate administrative unit by law faculty senates, committees, and catalogs at both the graduate and undergraduate level. A faculty member in one administrative unit has no claim of position in another unit, there is no interchange of faculty between the units except in limited and unusual situations, transfers of faculty from one unit to another are rare, and the faculty of the units do not have close contact with each other or understanding of each other's problems. Peer review and tenure are effectively departmental and college matters, even though the Board makes final appointments and officially grants tenure; and meaningful management decisions and faculty input to University government can only be made at a local level. The Chancellor of each administrative unit is charged with the development of standards for promotion, tenure, and merit salary increases, and these standards are promulgated in the first instance by colleges and departments. No employee group exists to represent all three administrative units, as faculty

organizations have previously been limited in scope to the administrative unit. Under the University 5-year plan, UN-L is, and should remain, the primary locus of doctoral education; and it is recognized that UN-O's primary mission is distinctly urban in its orientation, and will remain so. There is no system-wide committee on academic freedom and tenure, or range of faculty committees at the systems level comparable to that at the unit level. Finally, previously, and at the present time, matters relating to the faculty of each unit have been dealt with by the Board and Central Administration on a campus basis.

The AAUP/UN-L relies on these and similar facts in support of its position that the UN-L faculty has a community of interest confined to the boundaries of UN-L, and that there are fundamental differences between the major administrative units such that a bargaining unit for UN-L faculty is appropriate.

Witnesses for the petitioner also described the actual decision-making process in regard to tenure, promotions, hiring, and academic programs. Decisions on these issues are initially made at the departmental or college level, and recommendations are made to the Chancellor of the administrative unit. The Chancellor then makes his recommendations to the President, who in turn makes recommendations to the Board. The Board, in the vast majority of cases, follows the recommendations which were first made at the department or college level. Thus, the petitioner points out, although the Board does have the authority to make the final decision, each administrative unit, and the colleges and departments therein, play an important, if not dominant, role in the actual day-to-day decisions which affect the faculty of that unit. This fact is recognized in the by laws of the Board, which acknowledge and establish the unit structure of the University, and which acknowledge the authority and role of various parts of the unit in contributing to the decision-making process. The 5-

year plan adopted by the Board also acknowledges and reemphasizes the basic structure set out in the by laws.

The witnesses for the Board were officials in the Central Administration, and an expert on collective bargaining in institutions of higher education. The relevant testimony in favor of the Board's position was as follows: In 1972, the Board first adopted a policy that there should be a single, multi-campus bargaining unit. This policy was adopted in response to a petition by UN-O professors who sought to establish a bargaining unit for UN-O faculty. There was testimony that University labor policies operate within the confines of Board policies, and are carried out by Central Administration. The Board has adopted equalized fringe benefits for employees on a University-wide basis, is developing system-wide contract form procedures, and is establishing a unified academic calendar. Budget planning is done by the Central Admistration and the Board, although each Chancellor submits budget requests and is involved in the budgeting process, and represents the Deans and departments making budget requests to the Chancellor. The University has a central accounting, payroll, and computer network in regard to paying employee salaries. The University has a University-wide graduate college, although each unit has its own Dean of graduate studies and separate graduate catalogue. Inter-campus programs and committees exist, and there has been some interchange of faculty from one campus to the other. The amount of dollars a unit receives for delegation of funds to faculty for merit compensation is fixed by the Board. All decisions regarding tenure, promotion, merit increases in salary, and academic programs are made by the Board, and any recommendations by each major administrative unit are reviewed by the Central Administration before going to the Board. The University has an overall mission, and it is claimed that any differences

which exist between the units stem from the fact that units have different roles in contributing to the overall mission.

The expert witness for the Board was of the opinion that one, system-wide bargaining unit would be appropriate. He believed that the interests of all faculty, including the faculty of the Law, Dental, and Medical Colleges, could be accommodated in one unit. He stated that: "* * * I know of no exception of a public university — no exception to the rule that the bargaining unit consists of the institution as conventionally seen by faculty and the public." The expert felt that the structural organization of the University should be respected, and that a system-wide unit would avoid whipsaw tactics by different bargaining units, unnecessary bureaucracy, and unnecessary splintering. A single unit structure, in his opinion, would enhance the ease of agreement between the administration and the employees. The expert also admitted that he knew of no university in the United States where a law school wished to be excluded from a general bargaining unit, but was not allowed to have its own separate unit.

Additional facts relevant to the issue of whether department chairmen should be in a bargaining unit, and whether the Law and Dental Colleges should have separate units, will be discussed below.

In establishing the AAUP/UN-L as a separate bargaining unit, the CIR made the following findings of fact:

"1. There has never been any substantial continuing effort at organization at either of the other two campuses.

"2. There is no bargaining history at any campus. Respondent permits AFSCME and NAPE dues checkoff rights on its 'B' line and 'C' line employees, but denies this right to petitioner.

"3. Within guidelines and subject to central approval, hiring, firing, tenure and employment conditions

decisions are made not just at the local campus level, but at the Department or College level, rather than at the system-wide level.

"4. There is little interchange of faculty members between campuses.

"5. There is little integration of operations between campuses.

"6. While the University as a whole has a unified mission, the campuses each have a substantially different part in carrying out that mission.

"7. The University of Nebraska at Lincoln campus is predominantly the Doctorate and post-Doctorate locale. The University of Nebraska at Omaha campus has little doctoral emphasis, and is highly oriented toward urban problems. The University of Nebraska Medical Center is wholly directed toward producing professionals in the health and healing sciences.

"8. The College of Law, the College of Dentistry, and the University of Nebraska Medical Center are all separately accredited by professional bodies outside the academic atmosphere. All three have substantially more contact and interchange with the real world off campus than do the rest of the faculty.

"9. Each campus and the College of Law and Dentistry perceive themselves as separate and distinct entities. The faculty at the University of Nebraska at Lincoln still tends to regard the University of Nebraska at Omaha as a step-child."

In its brief, the Board contests most of these findings of fact. However, as indicated by the above summary of the evidence, we believe the findings of the CIR find support in the record.

Before proceeding to a discussion of the merits of this case, there is an initial procedural issue raised which is entitled to consideration even though it does not affect the outcome of the controversy. The Board sought to appeal to this court from the Court of Industrial Relation's determination establishing bargaining units, before elections in those units were held.

The CIR overruled the Board's motion to stay the elections pending the appeal. The Board contends that an order determining the composition of bargaining units is a final order, and thus it should not have been required to wait until the elections took place before it could appeal.

While no longer important in the instant case, we deem it advisable to settle this issue for guidance of future litigants. Section 48-812, R. R. S. 1943, provides that appeals from the Court of Industrial Relations to this Court are to be taken in the same manner as appeals from the District Court to this court. Section 25-1912, R. R. S. 1943, permits parties to appeal to this court from judgments and decrees rendered or "final orders" made by the District Court. Section 25-1902, R. R. S. 1943, defines a final order: "An order affecting a substantial right in an action, when such order in effect determines the action and prevents a judgment, and an order affecting a substantial right made in a special proceeding, or upon a summary application in an action after judgment, is a final order * * *." Thus the issue is whether an order by the Court of Industrial Relations establishing bargaining units is an appealable order under sections 25-1912 and 25-1902, R. R. S. 1943.

In Dorshorst v. Dorshorst, 174 Neb. 886, 120 N. W. 2d 32 (1963), this court stated that an "order is final and appealable when the substantial rights of the parties to the action are determined, even though the cause is retained for the determination of matters incidental thereto." In Lund v. Holbrook, 157 Neb. 854, 62 N. W. 2d 112 (1954), this court stated: "The law, as we understand it, is that an order is final for the purpose of an appeal when it determines the rights of the parties; and no further questions can arise before the court rendering it except such as are necessary to be determined in carrying it into effect." See, also, Sullivan v. Storz, 156 Neb. 177, 55 N. W. 2d 499 (1952). Under these cases, we believe that there is merit to

the Board's contention that it should have been permitted to appeal immediately from the order establishing the bargaining units. The only issue before the CIR was the propriety of the proposed bargaining units, and once that issue was decided, the only real controversy between the parties was terminated. All that remained to be done was the holding of elections in the units. When the propriety of the bargaining units established by the Court of Industrial Relations is to be contested in an appeal to this court, there is no economy of time or money in first holding the elections, as this court may determine that the bargaining units established by the CIR were erroneous. Courts in other jurisdictions agree that a party may appeal from an order establishing bargaining units prior to the holding of elections. See Civil Service Employees Assn., Inc. v. Helsby, 31 App. Div. 2d 325, 297 N. Y. S. 2d 813 (1969), affirmed 24 N. Y. 2d 933, 302 N. Y. S. 2d 822, 250 N. E. 2d 230 (1969). Therefore we hold that an order establishing bargaining units is a final order under section 25-1902, R. R. S. 1943, and a party may appeal therefrom prior to the holding of elections.

Section 48-837, R. R. S. 1943, grants public employees the right to be represented by employee organizations and to negotiate collectively with their public employers. A preliminary question to be determined in connection with collective bargaining is, of course, what bargaining unit of employees is appropriate. Subsection (2) of section 48-838, R. S. Supp., 1974, provides, in relevant part: "The court shall also determine the appropriate unit for bargaining and for voting in the election, and in making such determination *the court shall consider established bargaining units and established policies of the employer.* It shall be presumed, in the case of governmental subdivisions such as municipalities, counties, power districts, or utility districts with no previous history of collective bargaining, that units of employees of less than departmental size shall not be appropriate." (Emphasis

supplied.) This statute was originally enacted by the Legislature in L.B. 1228 in 1972.

The Board contends on appeal, as it did below, that the provision in this subsection to the effect that "the court shall consider established bargaining units and established policies of the employer" places a limitation on what factors the CIR may consider in establishing bargaining units, and eliminates as considerations those referred to by this court in City of Grand Island v. American Federation of S. C. & M. Employees, 186 Neb. 711, 185 N. W. 2d 860 (1971). In City of Grand Island, we stated that in determining what is an appropriate bargaining unit, consideration should be given to mutuality of interest in wages, hours, and working conditions; the duties and skills of employees; the extent of the union organization among the employees; and the desires of the employees. In applying those factors to the facts of that case, we upheld a determination that three bargaining units of various municipal employees were appropriate, rather than one unit for all the employees in question.

The Court of Industrial Relations rejected the Board's contention on this issue, and found that the considerations set forth in subsection (2) of section 48-838, R. S. Supp., 1974, were not exclusive, and that they are a guide rather than a limitation. The CIR was correct in so finding. It is clear that in enacting subsection (2) of section 48-838, the Legislature properly sought to avoid *undue* fragmentation of bargaining units. The pertinent legislative history is reviewed in IBEW v. State, II CIR 133/134 (1975). As noted in that case, the decision primarily responsible for the introduction of L.B. 1228 was IBEW v. City of Lincoln, 1 CIR 48-1 (1971), a case which dealt with the issue of when a governmental unit is required to deal exclusively with a labor organization. The legislative history to L.B. 1228 indicates that the Legislature, as a result of IBEW v. City of Lincoln, *supra,* was concerned with the possibility of unduly fragmented bar-

gaining units arising in Nebraska municipalities. There is nothing in the legislative history to indicate that established bargaining units and established policies of the employer were to be the *sole* considerations to which the CIR should address itself when determining the appropriate bargaining unit. The subsection merely sets forth considerations which the CIR shall consider, but in no way limits the CIR in considering other relevant factors such as those mentioned in City of Grand Island v. American Federation of S. C. & M. Employees, *supra*. Therefore, we find that the CIR was correct in considering factors in addition to those listed in section 48-838(2); and, in deciding this case on appeal, this court will consider all factors it deems relevant to the determination of the appropriate bargaining unit, including, of course, those set forth in the statute.

Three primary issues are raised in this case by the parties. The first and most difficult issue to be resolved in this case is whether the faculty of UN-L should be permitted to have a separate bargaining unit, or whether the faculty of both UN-O and UN-L should be included in one unit. A review of cases in other jurisdictions indicates that courts have reached differing conclusions on the issue of whether single-campus bargaining units are appropriate, or whether units should be system-wide. In New York, for example, a single bargaining unit was ordered for 26 separate campuses of the State University of New York; while in Michigan and New Jersey, single-campus units were found to be appropriate. See Moore, The Determination of Bargaining Units for College Faculties, 37 U. Pitt. L. Rev. 43, 46-48 (1975). In Minnesota, a single, statewide bargaining unit was found to be appropriate, although this determination turned largely on mandatory statutory criteria, and on the fact that three out of four employee representatives and the employer favored a statewide unit. See Minnesota State College Board v. Public Employ-

ment Relations Board, 303 Minn. 453, 228 N. W. 2d 551 (1975). In Fairleigh Dickinson University, 205 NLRB 673 (1973), university-wide bargaining unit was found to be appropriate where many of the employees favored such a unit, and where the highest academic body responsible for formulating academic policies to the University Board of Trustees had members from all campuses.

In Oregon State Employees Assn. v. Oregon College of Education, Oregon PERB Cases Nos. C-277, C-319, C-326, C-375, and C-230 (1974), the court found single-campus bargaining units to be appropriate, relying on factors such as existence of a community of interest among faculty on each campus, little integration of operations and work functions between campuses, limited transfer of academic personnel between campuses, and the existence of a supervisory, administrative structure on the campus level which had primary importance in employee matters. A single-campus bargaining unit was also found to be appropriate in In re Unit Determination for Certain Professional Faculty Members of Kansas State College of Pittsburg, Kansas, PERB Case No. UE 2-1974 (1974), where the court found that each campus within the state system had been granted wide latitude and autonomy by University of Kansas Board of Regents.

Even this brief review of cases from other jurisdictions indicates that factual color-matching of cases is difficult, if not impossible. First, the statutory criteria for bargaining units vary from state to state, and secondly, each state university system is unique. Cases from other jurisdictions are helpful, however, in identifying important factors which are relevant in determining whether a single-campus, or a system-wide, bargaining unit is appropriate. It has long been held that a basic inquiry in unit determinations is whether a community of interest exists among the employees which is sufficiently strong to warrant their inclusion in a single unit. See Note, 59 Va. L.

Rev. 492, The Appropriate Faculty Bargaining Unit in Private Colleges and Universities (1973). As stated in Cornell University, 183 NLRB 329 (1970): "In determining whether a particular group of employees constitutes an appropriate unit for bargaining where an employer operates a number of facilities, the Board considers such factors as prior bargaining history, centralization of management particularly in regard to labor relations, extent of employee interchange, degree of interdependence or autonomy of the plants, differences or similarities in skills or functions of the employees, and geographical location of the facilities in relation to each other. * * * [W]e regard the above principles as reliable guides to organizations in the educational context as they have been in the industrial, and will apply them to the circumstances of the instant case." The same factors have been considered by the courts in those cases previously cited in this opinion in regard to the issue of single-campus bargaining units. We deem it appropriate, therefore, to apply the facts of this case to those, and other, relevant considerations.

Prior bargaining history. — There has never been formal collective bargaining at the University of Nebraska between academic employees and the administration; nor has there ever been an attempt by any employee organization to form a University-wide collective bargaining unit. The UN-L faculty senate has informally engaged in discussions with the various administration officials regarding matters of importance to UN-L. There is no system-wide faculty senate or committee on academic freedom and tenure, and it is those bodies which traditionally have been vehicles for faculty participation in University government.

Centralization of management and labor policy. — The Board's evidence was that all labor policy of the University is made by the Board or the Central Administration. Chancellors of each major administra-

tive unit, however, govern their units on a day-to-day basis, and play an important role in labor management.

Extent of faculty interchange between campuses. — Although there has been limited interchange of faculty between UN-L and UN-O, it has not been significant. Although witnesses for the parties disagreed on the precise number and effect of transfers, there was no evidence showing that transfers were common, or that there has been a significant number of transfers.

Degree of interdependence of autonomy of the campuses. — There appears to be little interdependence between UN-L and UN-O, as the campuses are generally regarded as distinct entities, and the faculty of the two units do not have close contact. The few system-wide programs which exist are in specific fields, and UN-O and UN-L in effect function independently of each other.

Differences or similarities in skills or functions of the employees. — Generally, the faculty at both UN-L and UN-O perform similar functions and have similar skills. It should be noted, however, that the University 5-year plan recognizes that UN-L shall remain the primary locus of doctoral education, and UN-O shall remain primarily urban in orientation. This fact affects the role of the faculty at each campus, and differences between faculty do exist due to the particular nature of each campus.

Geographical location of the campuses in relation to each other. — Here, obviously, the campuses are in two different cities, approximately 60 miles apart. Although this fact is not in and of itself determinative of the issue, the location of the campuses does affect the sense of collegiality and sense of community the faculty on each campus have with each other.

Uniformity of wages, benefits, and conditions of employment. — The University, through the Board, has attempted to provide uniform wage and fringe bene-

fits to all University faculty. Conditions of employment include, however, facilities in which employees work, and academic programs which exist or are available on each campus. These are clearly different at UN-O and UN-L. This fact is relevant in that the petitioner is concerned not only with wages, but also with academic planning, funding for programs, and the facilities available to the faculty.

Current means of governing the University. — It is undisputed that the by laws of the Board provide that the Board has the ultimate power to make decisions regarding tenure, hiring, firing, promotion, merit salary increases, academic programs, and budgeting. Although the formal governing procedure for the University is obviously a very important factor in this case, this court must examine how decisions are made in fact, as well as how they appear to be made under the by laws. It is clear that day-to-day decisions affecting employment issues are made at the campus level, and that many of the decisions which affect employees are made by the Board and the Central Administration on recommendation of Chancellors, and other administrators within the campus unit. It should be noted that in giving final approval of decisions in regard to hiring, firing, tenure, and employment conditions, the Board has previously acted on a campus basis rather than on an area of interest basis. The Board has, for example, previously approved the grant of tenure to faculty at UN-O and UN-L separately.

Established policies of the employer. — The Board adopted its position that there should be a single, system-wide bargaining unit in 1972, in response to a petition by faculty members at UN-O who requested a bargaining unit limited to faculty on that campus. No conclusive legal action was ever taken on that issue in 1972.

Community of interest of employees. — Witnesses for the petitioner emphasized their belief that UN-L

faculty share a community of interest with each other, and not with faculty at UN-O. The Board acknowledged differences between the two campuses, but attributed these differences to the fact that each campus contributes to the overall mission of the University in different ways.

Possibility of over-fragmentation of bargaining units. — The Board relies heavily on the argument that separate bargaining units would result in over-fragmentation of the bargaining process. Having one bargaining unit, witnesses for the Board stated, would avoid "whipsaw" tactics between different bargaining units, and unnecessary bureaucracy. Two commentators, cited by the Board, recommend that bargaining units in the public sector "should be as broad as is consistent with viable negotiations." See, Shaw, L.C. & Clark Jr., R.T., Determination of Appropriate Bargaining Units in the Public Sector: Legal and Practical Problems, 51 Ore. L. Rev. 152 (1971); Gee, E.G., Organizing the Halls of Ivy; Developing a Framework for Viable Alternatives in Higher Education Employment, Utah L. Rev. 233 (1973). Gee, for example, argues that units should parallel the University structure, to "insure that unions bargain with officials having final bargaining authority and to avoid alteration or nullification of agreements by a higher authority."

Although the Board relies on factors such as its ultimate authority to make decisions affecting employee interests, its previous stance in 1972 on the issue of what bargaining unit is appropriate, the uniformity of wages and skills of University faculty, and the centralization of University management, its principal argument is that separate bargaining units would result in undue fragmentation of collective bargaining. In this case, however, that danger does not appear to be serious, as there is a limitation to the likelihood of over-fragmentation. Essentially, the issue is whether, in addition to the professional schools, here-

inafter discussed, one or two units is appropriate. It is not a case, as was true in New York, where single campus units would result in more than 20 bargaining units. Furthermore, at the hearing, the Board made no persuasive evidentiary showing in support of its assertion that a single-campus bargaining unit would result in undue fragmentation.

After carefully reviewing the entire record and considering the relevant factors set out above, we are of the conclusion that the Court of Industrial Relations was correct in establishing a bargaining unit which included UN-L faculty, but not UN-O faculty. Essentially, this conclusion rests on our belief that the UN-L faculty has a sufficient community of interest, separate from the faculty of UN-O, which warrants a separate unit. Recapitulating, we believe the following considerations, as previously discussed, support this conclusion. Employee bodies which represented faculty concerns, such as the faculty senate or committee on academic freedom and tenure, exist on a campus level, and not at the systems level. There is no significant faculty interchange between campuses. UN-L and UN-O function largely independent of each other so far as the faculty on each campus is concerned. Although the general skills of the University faculty are similar, the different missions and roles of each campus affect faculty interests and conditions of employment on each campus. The geographic location of the two campuses contributes to the lack of community of interest between the faculty on each campus. Although the Board has ultimate power to make decisions affecting the faculty on both campuses, this power in fact is diffused throughout the system, and administrators on each campus play a critical role in regard to employee matters. Faculty of UN-L perceive themselves as having a community of interest different from, and often in contrast with, the community of interest at UN-O. Finally, due to the unique situation presented, the likelihood of

undue fragmentations appears to be minimal under the evidence adduced. Although no one of the above considerations is, in and of itself, controlling, together they support the conclusion of the Court of Industrial Relations that a separate bargaining unit for UN-L faculty is appropriate.

We believe this conclusion is in accordance with the decisions from other jurisdictions cited previously in this opinion. Although the facts in this case are not precisely on all fours with the facts of any other case, they are more closely analogus to those cases where a single-campus bargaining unit was established.

The next issue for determination is whether it was error to establish separate bargaining units for the College of Law faculty and the College of Dentistry faculty. Cases in other jurisdictions have almost been unanimous in holding that the faculty of law schools, dental schools, and medical schools are appropriately excluded from a general bargaining unit of university faculty. In University of Miami, 213 NLRB 634 (1974), for example, the law faculty was held to be a separate bargaining unit for the following reasons: (1) It had buildings separate from the rest of the university; (2) the law school was accredited under ABA Standards, and adherence to those is needed to enable graduates of the law school to be admitted to state bar associations; (3) the law school had a different academic calendar; (4) law professors received higher salaries than the faculty of the rest of the university; (5) law professors received promotion and tenure in a shorter period of time than do other faculty members of the university; and (6) the law faculty and dean had significant operational independence on a day-to-day basis. Analogous rationale was used in University of Miami to support exclusion of the medical school from the general bargaining unit of other university faculty. In University of Vermont & State Agricultural College, 223 NLRB 46 (1976), a medical faculty was held to be ex-

cluded from the general bargaining unit because its faculty members shared a community of interest apart and separate from other faculty members; it had a significant lower student-teacher ratio; operated on a full-year basis; had a higher salary scale and a higher budget; and its students and faculty were detached from the rest of the university. In Fairleigh Dickinson University, 205 NLRB 673 (1973), the court stated the dental school could properly have been excluded from the general bargaining unit for reasons similar to those cited above regarding law schools and medical schools, but included the dental school in the general unit because no organization had requested that it be excluded. Underlying these decisions is the recognition that the number of members of law, medicine, and dental faculties is small, and they should not be subjected to having their higher salaries, separate calendars, and distinctive working conditions traded away in a system-wide bargaining process. See, e.g., Moore, The Determination of Bargaining Units for College Faculties, 37 U. Pitt. L. Rev. 43, 61 (1975).

Numerous other cases have held that law, medical, and dental faculties are properly excluded from the general faculty unit. See, In re Employees of Temple University, PERA-R-1123-E and PERA-R-1137-E (PLRB, 1972); University of San Francisco, 207 NLRB 12 (1973); Catholic University, 201 NLRB 929 (1973). In other cases it has been held that a law faculty may be included in the general bargaining unit if it so desires, and that the law faculty should vote on whether it wishes to have a separate unit. See, New York University, 205 NLRB 4 (1973); Syracuse University, 204 NLRB 641 (1973).

In our present case, the factors relied on in the above cases to exclude law school, medical schools, and dentistry schools were established by the evidence. The College of Law has separate buildings, is accredited under ABA Standards, sets its own calendar, the professors receive higher salaries and obtain

tenure more quickly than professors in the rest of the University, and the law faculty has significant operational independence on a day-to-day basis. There is also little doubt that the College of Law has an identifiable community of interest separate from the rest of the University. Similar factors are present in regard to the College of Dentistry. In light of the overwhelming precedent in other jurisdictions, and ample evidence to support the view that the law and dental faculties have a community of interest separate from that of other faculties in the University, we find that the CIR was correct in concluding that separate bargaining units were appropriate for the faculties of these two professional schools.

Finally, we turn to the question of whether department chairmen should have been excluded from the employee bargaining units because they are supervisors, and therefore part of the University administration and management. The Board contends that department chairmen are a part of the administration because they receive additional compensation for their administrative duties, and because they perform managerial functions such as class scheduling, review of class content, faculty evaluations and recommendation of appointments, promotions, grants of tenure, contract terminations, and merit salary increases. Petitioner and interveners contend that department chairmen in fact act in accordance with the sense of collegiality which exists among all department faculty, and that their role as administrators is secondary to their role as faculty in their departments. The Court of Industrial Relations found that department chairmen were "of the faculty, and not over it," and therefore included them in the bargaining units.

Cases in other jurisdictions are split on the issue of whether department chairmen should be included in faculty bargaining units. Cf. Fairleigh Dickinson University, 205 NLRB 673 (1973); Syracuse Univer-

sity, 204 NLRB 641 (1973); Point Park College 209 NLRB 1064 (1974); and Eastern Michigan University, M.E.R.C., No's. R70, K-470 and R71 A-2 (1972); with Fordham University, 193 NLRB 134 (1971); C.W. Post Center of Long Island University, 189 NLRB No. 109 (1971); State University of New York, 2 N.Y.P.E.R.B., paragraph 4010 (1969); and In re Employees of Temple University, PERA-R-1123-E and PERA-R-1137-E (PLRB, 1972). For a collection of cases, and commentary, see Moore, The Determination of Bargaining Units for College Faculties, 37 U. Pitt. L. Rev. 43, 48-54 (1975); and Note, The Bargaining Unit Status of Academic Department Chairmen, 40 U. Chi. L. Rev. 442. These cases and authorities indicate that the critical factor in regard to inclusion or exclusion of department chairmen is whether the chairmen in fact have the power to effectively make determinations on such matters as promotions, tenure, and salary in their departments. Cases where the issue has been raised, therefore, have been decided on a case-by-case basis, and the actual power and authority of the department chairmen has been analyzed in each case to determine whether they are supervisory personnel and a part of management.

The testimony of the petitioner in this case was that department chairmen are creatures of the faculty, not the administration, and act in accordance with the desires of the faculty of their departments. Department chairmen who testified stated that they were only secondarily administrators, and that they made decisions on the basis of interaction with their own department faculty. They stated that, although a chairman may make final decisions in regard to recommendations, he does so within the confines of the collegiality which exists among his faculty.

The Board offered little evidence to contradict witnesses for the petitioner, and essentially relied on the fact that, officially, department chairmen are charged with administrative duties for which they

are responsible. It also emphasized that the department chairman is the person charged with providing the administration with recommendations on such matters as promotions, tenure, and contract termination. We note, however, that section 2.11 of the by laws of the Board provides that the department chairman "shall be the presiding officer of its faculty and the chief advisor to the dean or director of the administrative unit to which the department is assigned. * * * The chairman of the department may make recommendations to the dean and the faculty of the college concerning the welfare of the department or its relations to other departments. *Before making such recommendations the chairman of the department shall consult with the appropriate departmental faculty.* Where the recommendation of the chairman differs from the advice given by the appropriate departmental faculty, the chairman shall so inform the dean." (Emphasis supplied.) This by law provision itself recognized that department chairmen are to consult with their faculty before making recommendations, and are to inform the Dean of their college when the departmental faculty disagrees with a recommendation.

After reviewing the evidence on this issue, we believe that department chairmen, do, except perhaps in extraordinary situations, act as a part of the faculty rather than part of the administration. As stated in Northeastern University, 218 NLRB 247 (1975), in determining whether department chairmen should be included, consideration has been given to the principle of "collegiality." Where the chairmen's powers have been effectively diffused among the department faculty pursuant to this principle, chairmen should be included in the bargaining unit. In this case the evidence clearly favors the view that department chairmen act as creatures of the faculty rather than the administration, and within the spirit of collegiality which exists in their departments. Therefore we

hold that the Court of Industrial Relations was correct in including the department chairmen within the bargaining units. See, Fordham University, *supra;* In re the Employees of Temple University, *supra.*

We conclude by noting the appropriate standard of review applicable in this case. Although in previous cases we have held that appeals from the Court of Industrial Relations to this court are heard de novo pursuant to section 48-812, R. R. S. 1943, we now believe that a more limited review is required because the function the Court of Industrial Relations exercises is a legislative one, and a statute which purports to delegate to the courts de novo review of an exercise of a legislative power is unconstitutional. See, Scott v. State ex rel. Board of Nursing, 196 Neb. 681, 244 N. W. 2d 683 (1976); Orleans Education Assn. v. School Dist. of Orleans, 193 Neb. 675, 229 N. W. 2d 172 (1975); School Dist. of Seward Education Assn. v. School Dist. of Seward, 188 Neb. 772, 199 N. W. 2d 752 (1972). We now hold that review by this Court of orders and decisions of the Court of Industrial Relations is restricted to considering whether the order of that court is supported by substantial evidence justifying the order made, whether it acted within the scope of its statutory authority, and whether its action was arbitrary, capricious, or unreasonable. To the extent prior cases hold that appeals from the Court of Industrial Relations are heard de novo in this court, they are overruled.

In applying the appropriate standard of review in the present case, we find that the decision of the Court of Industrial Relations is supported by substantial evidence, that the CIR acted within the scope of its statutory authority, and that its action was not arbitrary, capricious, or unreasonable. The decision of the Court of Industrial Relations was correct in all respects, and is affirmed.

AFFIRMED.

SPENCER, J., dissenting.

I respectfully dissent from the majority opinion for three reasons:   (1) The result reached by the Court of Industrial Relations, hereinafter designated CIR, is contrary to the substantial weight of the evidence; (2) the fragmentation of bargaining units among public employees of the State of Nebraska is contrary to the public policy of our state labor law as set forth in the provisions of section 48-802, R. R. S. 1943; and (3) department chairmen should be excluded from any bargaining unit organized to represent the academic employees of the Board of Regents.

Two predominant public policies lie at the heart of Nebraska's public sector labor law.  These are the protection of the public interest in assuring the continuous operation and efficiency of governmental services, and providing public employees with a meaningful avenue through which they may negotiate wages, hours, and conditions of employment.

The majority opinion ignores the first of these problems by permitting undue fragmentation of the bargaining unit.  Not only may every professional college — Law, Dentistry, Medicine, Teachers, Engineering, Pharmacy, Agriculture, etc., have its own bargaining unit, but other groups within the state University system may do likewise.  The record indicates the Law College faculty numbers 18 and the Dental College faculty 52, exclusive of the Deans.

As Doctor Weinberg, Board's expert, testified, and as many of the commentators suggest, fragmentation leads directly to development of expensive and administratively unmanageable bargaining structures and to increased administrative costs once an agreement is reached.  It fosters proliferation of personnel necessary to bargain and administer contracts on both sides of the bargaining table.  It destroys the ability of public institutions such as the University to develop, administer, and maintain any semblance of uniformity or coordination in their employment poli-

cies and practices. In the long run, it results in an inefficient, ineffective, and unworkable relationship for all parties concerned. Its ultimate effect is to substitute litigation for negotiation as the principal dispute-resolving process in the public sector. In effect, it defeats the purpose of Nebraska's public sector labor law.

Shaw & Clark, in their article on Determination of Appropriate Bargaining Units in the Public Sector, Legal and Practiced Problems, 51 Ore. L. Rev. 152, epitomize the problem as follows: "The more bargaining units public management deals with, the greater the chance that competing unions will be able to whipsaw the employer. Moreover, a multiplicity of bargaining units make it difficult, if not impossible to maintain some semblance of uniformity in benefits and working conditions. Unfortunately, in many states and localities bargaining units have been established without consideration of the effect such units will have on negotiations or on the subsequent administration of an agreement. The resulting crazy-quilt pattern of representation has unduly complicated the collective bargaining process in the public sector."

We last considered the proper scope and composition of bargaining units in the public sector in City of Grand Island v. American Federation of S. C. & M. Employees, 186 Neb. 711, 185 N. W. 2d 860 (1971). In 1972, following that decision, the Legislature passed L.B. 1228. That bill, which became effective in July 1972, made two very important changes in Nebraska's labor law. First, it articulated an express legislative policy against fragmentation of bargaining units in the public sector of this state; and, second, it codified the criteria which were to be taken into account in resolving unit determination questions.

Further, City of Grand Island v. American Federation of S. C. & M. Employees, *supra,* delineated what I insist is the proper method of review in this case. We

there said: "The review in the Supreme Court of proceedings before the Court of Industrial Relations is in the manner provided by law for equity cases." See § 48-812, R. R. S. 1943. "We are required to reach an independent conclusion as to disputed issues of fact. § 25-1925, R. R. S. 1943."

It is significant that in adopting section 48-838, R. S. Supp., 1974, the Legislature did not allude to an appropriate bargaining unit as did this court in City of Grand Island v. American Federation of S. C. & M. Employees, *supra*. To the contrary, the statute reads: "The court shall certify *the* exclusive collective bargaining agent of employees affected by sections 48-801 to 48-823 * * *." (Italics supplied.)

In adopting L.B. 1228, the Legislature specifically incorporated a policy against fragmentation by providing: "It shall be presumed in the case of governmental subdivisions such as municipalities, counties, power districts, or utility districts with no previous history of collective bargaining, that units of employees of less than departmental size shall not be appropriate." § 48-838(2), R. S. Supp., 1974.

It is not necessary to guess at the intent of the Legislature on the issue of fragmentation. The comments before the committee and on the legislative floor adequately portray the desire to avoid it. An attorney representing public employees testified: "Of the attorneys involved in preparing this bill, they represented both sides of the cases that have been before the court. They represented government bodies as well as unions and associations and they all agreed that broad industrial type bargaining units are advantageous for the public employer, and that there is no purpose served in fragmenting units."

Finally, the international representative for the International Brotherhood of Electrical Workers specifically stated: "LB 1228 provides that the Court of Industrial Relations shall determine what is a proper unit for the purposes of collective bargaining and for

the purposes of voting in collective bargaining elections, and provide some ground rules for the Court to use in making such determinations. The proper determination of a bargaining unit is important to both parties in a collective bargaining arrangement, because it adds to stability to the relationship between the employees and their employers. It provides first, that the employer can deal with the employees with a common interest to one representative, and secondly, it frees the employer from having to deal with a number of collective bargaining agents each representing a small segment of its employees.''

Inexplicably, the CIR has failed to follow its own prior finding in a case involving University of Nebraska employees, specifically recognizing the statutory policy against fragmentation in the public sector. In his opinion in IBEW v. State, 3 CIR 133/134 (1975), Judge Dean Kratz specifically found as follows: "Respondent also argues that L.B. 1228 effectuated a clear policy against proliferation of bargaining units in public employment in the State of Nebraska and that the creation of units proposed by the Petitioner would be violative of the legislative pronounced policy against proliferation of bargaining units in the public sector and would irrevocably interfere with the public interest of assuring the economic continuity of governmental service.

"We agree that LB 1228 was precipitated by a desire to avoid fragmented bargaining units."

The CIR made a number of factual findings which were crucial to its determination herein. These findings are in some cases not supported by any evidence in the record whatsoever and in a large part appear to be based on the hearing judge's mistaken intuitive assessment rather than on the testimony and documentation adduced at the hearing.

Specifically, on page 4 of the order, the CIR found the University of Nebraska labor policy on unit determination to be based on outdated legal prece-

dents. There was substantial testimony that the University of Nebraska has a system-wide labor relations policy, administered by a single individual in the Central Administration. Yet, there is no direct evidence in the record whatsoever to support the CIR's finding.

Similarly, there is no evidence supporting the CIR's determination on page 5 of the order relative to the dues check-off question or its finding in paragraph 9 on page 6 of the order that the faculty of the University of Nebraska Lincoln still tends to regard the University of Nebraska at Omaha as a stepchild. Not only are these fact findings without basis in the record, they are of dubious relevance to the unit determination question herein, and indicative of a prior bias.

I take exception to the CIR's factual determinations because they wholly overlook the uncontroverted testimony of the Board's witnesses which established that the University of Nebraska is a highly integrated statewide University system which employs academic staff who, subject to the highly centralized direction and control of the Board and the Central Administration, enjoy substantial identity in wages, fringe benefits, and other terms and conditions of employment.

The CIR finds on page 5, paragraph 3 of its opinion, that hiring, firing, tenure, and employment condition decisions are made at the department or college level rather than at the system-wide level. This is wrong. In fact, the evidence below clearly establishes that these decisions are made by the Board of Regents on a system-wide basis pursuant to uniformly established and centrally administered board policies. Apparently, the CIR has taken the delegation of certain supervisory and administrative duties to the various campuses and their respective colleges, schools, and departments to be a carte blanche grant of autonomy or abdication of author-

ity by the Board of Regents and the Central Administration. Certainly, nothing could be further from reality.

In paragraph 7, on page 6 of its order, the CIR found that the University of Nebraska Lincoln campus is predominately the doctorate and postdoctorate locale, while the University of Nebraska at Omaha campus has little doctoral emphasis. The finding emphasizes doctoral studies but overlooks entirely the relationship between the two campuses and their emphasis on graduate studies as a whole. Doctor Steven B. Sample testified in terms of both credit hours and student enrollment: "There is a parity of graduate students between the Lincoln campus and the Omaha campus." Further, the CIR wholly failed to consider the fact that the graduate college of the University of Nebraska, which supervises all graduate studies including the doctoral and postdoctoral studies, is a campus-wide college and not limited to any single campus.

Finally, I note that although the CIR specifically finds in its opinion that there is little interchange or integration among the campuses, the record itself shows that there is a high degree of administrative and functional integration and substantial interchange in the common missions, common administration structures, common academic calendar and composition and structure, common budgetary planning, University-wide accreditation, common labor relation policies, common affirmative action, and central accounting and payroll programs. Further, the campuses are integrated through a number of duplicated programs, intercampus programs, University-wide councils and committees, a University-wide graduate college, and a substantial identity of employment practices. It is apparent to me that the findings of the CIR are not supported by the record.

The CIR has completely ignored other facts which are highly relevant herein. It failed to recognize the

common and centrally administrative and academic structure of the University. It has overlooked centralized control of curriculum and budgetary planning. It has largely ignored the University's uniform employment classification system, employment contract procedures, evaluation procedures, and uniform standards for promotion, tenure, and merit pay.

As the Board suggests, even more significantly, the CIR has not even mentioned the fact that all the Board's academic employees enjoy a common centrally controlled wage policy, and have identical fringe benefit programs. They enjoy the same terms and conditions of employment in the following areas: Vacation policies; salary determination; professional leave policies; outside employment policies; patent policies and political activity policies; and conflict of interest policies.

I do not accept the conclusions and findings of the CIR. If this court puts its stamp of approval on the findings of the Court of Industrial Relations in this case, it is abdicating its authority as a court of last resort and is in effect giving that authority to the Court of Industrial Relations.

The Board has directed our attention to several state university cases which support its position. The Minnesota Supreme Court, in Minnesota State College Board v. Public Emp. Rel. Board, 303 Minn. 453, 228 N. W. 2d 551 (1975), affirmed a holding that the appropriate geographical scope of a bargaining unit for faculty employed at seven state colleges was a statewide bargaining unit. In that case, unlike the instant one, there were local adaptations, different programs, local constitutions, grievance procedures, and local administrative policies on each of the college campuses. Also, the president of each state college had the apparent authority to recruit, appoint, retain, remove, sanction, grant salary increases, tenure, and promotions to and define the

duties of all persons employed by the college. The Minnesota court overlooked these factors and pointed to the existence of the state college board as a single employer with centralized budgetary and academic planning functions, and held that a statewide planning unit was appropriate.

In Board of Regents of Eastern Michigan University v. Eastern Michigan U., 46 Mich. App. 534, 208 N. W. 2d 641 (1973), the Michigan court noted that the objective to be obtained in unit determination was to constitute the largest possible unit consistent with the community of interest of the membership. Michigan has never split faculty units by campus or location, but has consistently held in favor of system-wide faculty units.

In Pennsylvania State University, P. L. R. B., case No. PERA-R-801-C (1973), the Pennsylvania Labor Relations Board refused to find a unit of academic employees limited in scope to only 1 of the 18 branch campuses appropriate, on the basis that such a decision would result in overfragmentation and would make integrated operation of the university impossible.

Similarly, in State University of New Jersey, P. E. R. C., cases Nos. RO-210 and RO-221 (1973), the New Jersey Commission reversed an earlier stand assumed in 1969, and determined that a statewide unit encompassing all academic employees of New Jersey's various state colleges was an appropriate bargaining unit.

In State University of New York, P. E. R. B., cases Nos. C-0253, C-0260, C-0262, C-0263, C-0264, and C-0351 (1969), the New York Public Relations Board refused to establish separate bargaining units for the State University of New York although it consisted of 4 university centers, 11 4-year colleges, 2 medical centers, a college of forestry at Syracuse, and Green College at Fort Schuyler, 4 contract colleges at Cornell, a college of ceramics at Alfred Uni-

versity, 6 2-year agricultural and technical colleges, and 31 community colleges.

Two of the cases relied on by the Court of Industrial Relations — Oregon State Employees Assn., cases Nos. C-277, C-319, C-326, C-375, and C-230 (1974), and In re Kansas State College of Pittsburgh, P. E. R. B., case No. UE2-1974 (1974), do not lend support to the decision. Both these cases are distinguishable by their facts, and the Oregon case is distinguishable on the basis of the law on which it is based.

The decision herein should be based on our own act. I have set out the Board's authorities merely to show how other states have met the problem. In my judgment, the bargaining units established by CIR are not appropriate, either in scope or composition. I believe the intent of L. B. 1228 (section 48-838, R. S. Supp., 1974), mandates a multi-campus bargaining unit, encompassing all academic employees, regardless of their physical location. At the very least, there definitely should not be any fragmentation on any campus.

Individuals holding the position of department chairmen are appointed by the Board of Regents and not elected by the faculty. They receive additional compensation for their administrative duties. In actual performance of management functions, the evidence indicates they are responsible within their departments for class scheduling, class assignments, review and approval of individual class content, and faculty evaluations. They are the individuals who recommend appointments, promotions, grants of tenure, nonrenewal of contracts, terminations, and merit salary increases. As one of petitioner's witnesses testified, chairmen are responsive to the needs and desires of the faculty within their departments, but when the decision has to be made, the department chairman has to make a decision. "That's what leadership is all about."

Historically, in the private sector, supervisors have been considered a part of management. The National Labor Relations Act specifically provides: "* * * no employer subject to the act shall be compelled to deem individuals defined herein as supervisors as employees * * *." N. L. R. A., § 14a, 29 U. S. C., § 164a (1970 Ed.). It seems to me this is even more important in the public sector. I agree with the position of the Board of Regents that department chairmen are not representatives of the faculty but are in effect administrative management personnel.

I would reverse the judgment of the Court of Industrial Relations for each of the three reasons delineated above.

WHITE, C. J., and NEWTON, J., join in this dissent.